**J. F. CRAWFORD et al., Plaintiffs-Appellants,**

v.

**AMERICAN TITLE INSURANCE COMPANY et al., Defendants-Appellees.**

No. 74–2242.

United States Court of Appeals, Fifth Circuit.

Aug. 27, 1975.

George R. Stuart, III, Birmingham, Ala., for plaintiffs-appellants.

James P. Alexander, John H. Morrow, Douglas Arant, Ollie L. Blan, Jr., Birmingham, Ala., John C. Christie, Jr., Chicago, Ill., Clarence M. Small, Jr., Robert McDavid Smith, Drayton T. Scott, Birmingham, Ala., John H. Shenefield, Richmond, Va., for defendants-appellees.

Before AINSWORTH, GODBOLD and SIMPSON, Circuit Judges.

PER CURIAM:

Faced with deciding how closely the federal courts should scrutinize state schemes for regulating insurance practices [1] before determining that the McCarron-Ferguson Act exemption, Title 15, U.S.C., § 1012(b), from federal antitrust laws applies, the district court adopted a middle of the road approach and held [2] that the statutory scheme, em-

1. Here, the asserted monopolistic practices were those of private price-fixing agreements between title insurance companies. The parties stipulated that the business of writing title insurance was within the scope of insurance business as defined by the McCarron-Ferguson Act and for purposes of this litigation.

2. The district court's opinion is reproduced as an Appendix hereto.

bodied in Code of Alabama, Title 28A, § 227 et seq., for regulation of the specific industry, was sufficient to bring the title insurance industry within the exemption. He rejected the argument of plaintiffs-appellants, representing a class of Alabama title insurance purchasers, that a companion Alabama Statute, Code of Alabama, Title 28A, § 253,—claimed by appellants to control, as the specific takes precedence over the general—operates to prevent the Alabama Insurance Commissioner from taking any action respecting rates or rate fixing within the title insurance industry.

The district court opinion precisely stated the issues, analyzed them in the light of existing precedent, and reached what we think was the correct decision. For the reason stated by the district court, its judgment dismissing the action is affirmed.[3]

Affirmed.

## APPENDIX

## MEMORANDUM OPINION

(Number and Title Omitted)          (Filed Apr 17, 1974)

The plaintiffs on behalf of themselves and others, bring this action under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, against nine title insurance companies and agents. It is alleged that defendants engaged in an "unlawful combination and conspiracy in unreasonable restraint of trade and commerce . . . to raise, fix and maintain the prices for premiums or fees charged for the issuance of title insurance policies in the 'Greater Birmingham Area.'" It is also alleged that defendants have conspired to monopolize, attempted to monopolize, and have monopolized such trade and commerce under this same federal antitrust law.

Each of the defendants has separately moved to dismiss the complaint for failure to state a claim upon which relief can be granted and for lack of jurisdiction over the subject matter, grounded upon the McCarron-Ferguson Act, 15 U.S.C. § 1011 et seq.

The McCarron-Ferguson Act provides in relevant part that "the Sherman Act . . . shall be applicable to the business of insurance to the extent that such business is not regulated by State law." 15 U.S.C. § 1012(b). To the extent a state regulates such business by state law, the Sherman Act and other federal antitrust laws are not applicable. This Court concludes that the State of Alabama has regulated the business of title insurance within the meaning of the McCarron Act so as to render the Sherman Act inapplicable and, that therefore, the motions of the defendants should be granted.

The McCarron Act renders the federal antitrust laws inapplicable when state legislation generally proscribes, permits or otherwise regulates the conduct in question and authorizes enforcement through a scheme of administrative supervision. *FTC v. National Casualty Co.*, 357 U.S. 560, 78 S.Ct. 1260, 2 L.Ed.2d 1540 (1958); *California League of Ind. Ins. Pro. v. Aetna Cas. and S. Co.*, 175 F.Supp. 857 (N.D.Cal.1959); *Commander Leasing Co. v. Transamerica Title Ins. Co.*, 477 F.2d 77 (10th Cir. 1973).

Without question Alabama has generally regulated title insurance throughout any relevant period. The Insurance Code of Alabama (*Code of Alabama*, Recompiled, 1971 Cumulative Supplement) contains numerous provisions applicable generally to all insurance companies as well as other provisions specifically ap-

---

**3.** For recent cases adopting the same basic approach in analogous situations as that adopted by the Alabama district court see the following: *Harrison v. Chicago Title and Trust Company*, 1974–2 Trade Cases, ¶ 75,321 (D.Kans. July 31, 1974); *Mitgang v. Western Title Insurance Company*, 1974–2 Trade Cases, ¶ 75,322 (N.D.Cal. October 16, 1974). See also *Meicler v. Aetna Casualty and Surety Co., et al.*, 5 Cir. 1975, 506 F.2d 732; *Addrisi v. Equitable Life Assurance Society of the United States*, 9 Cir. 1974, 503 F.2d 725, cert. denied 1975, 421 U.S. 922, 95 S.Ct. 1590, 43 L.Ed.2d 790.

plicable to title insurance companies.[1] Indeed plaintiffs concede that Alabama has generally regulated title insurance (also conceding, as they must, that title insurance is "insurance" within the meaning of the McCarron Act). They rest their case on the contention that the specific conduct alleged in this case has not been regulated by Alabama. This is the crucial question.

In 1957, Alabama enacted the Insurance Trade Practices Law, now Title 28A § 227 et seq. That statute was enacted expressly in response to the McCarron Act (as stated in its preamble. Title 28A § 227). It specifically prohibits "*all* unfair methods of competition" (emphasis supplied) in the business of insurance, and grants specific administrative and supervisory powers to the Insurance Commissioner pursuant to the prohibition.

It can hardly be argued that the phrase "all unfair methods of competition" may not encompass unauthorized agreements to fix premium rates or monopolistic practices as charged in this case. It must be remembered that the draftmen of the model Insurance Trade Practices Act, upon which the Alabama Act is patterned, specifically intended to respond to the invitation of the McCarron Act to withdraw from federal control (and concomitantly place under state control) the very kind of conduct which is charged here.[2]

Moreover the same terminology ("unfair methods of competition") had been used in Section 5 of the Federal Trade Commission Act (of which the Alabama Insurance Trade Practices Law is a counterpart) and has been interpreted to cover a broad spectrum of unauthorized trade practices, including establishment of rates and charges. *F.T.C. v. Brown Shoe*, 384 U.S. 316, 86 S.Ct. 1501, 16 L.Ed.2d 587; *F.T.C. v. Cement Institute*, 333 U.S. 683, 68 S.Ct. 793, 92 L.Ed. 1010, reh. den. 334 U.S. 839, 68 S.Ct. 1492, 92 L.Ed. 1764. More importantly here, it has been uniformly held that "a violation of the Sherman Act is an 'unfair method of competition' under the Federal Trade Commission Act." *Federal Trade Commission v. Beech-Nut Packing Co.*, 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307; *Union Circulation Co. v. Federal Trade Commission*, 241 F.2d 652 (CA 2 1957). It is necessary to conclude that the same conduct would be subject to regulation by the Alabama Insurance Commissioner under the Alabama Trade Practices Law since the Supreme Court of Alabama has held that federal court interpretation of similar terms used in federal statutes is to be followed. *Jackson Securities & Investment Co. v. State*, 241 Ala. 288, 2 So.2d 760, 763 (1941) ("Our statute using a term defined by the federal courts should ordinarily be considered as having the meaning thus given by those courts, if consistent with our conception of its true meaning"); *Avery Freight Lines, Inc. v. Alabama Public Service Commission*, 267 Ala. 646, 104 So.2d 704, 709 (1958). ("In construing the terms and provisions of Alabama statutes derived from federal statutes, such terms and provisions will usually be considered as having the meaning given by the federal courts").

This Court concludes, therefore, that the Alabama Insurance Trade Practice Act, reaching as it does *all* unfair methods of competition, places the very conduct charged in the complaint within the ambit of activities over which the Insurance Commissioner has broad regulatory powers.

---

1. Title 28A became effective January 1, 1972. However, prior to that date its predecessor, Title 28, as well as Article 10 of Article 7 of Title 10 of the Alabama Code, contained similar provisions pertaining to insurance generally and to title insurance specifically which are now codified in Title 28A. Regulation prior to 1972 was not materially different from that provided in the current Insurance Code.

2. The McCarron Act itself was prompted by the Supreme Court's decision in *United States v. South-Eastern Underwriters Assn.*, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440, which itself involved charges of violations of Sections 1 and 2 of the Sherman Act.

Notwithstanding the foregoing, plaintiff contends that Alabama has specifically excepted title insurance (as well as life insurance and health and accident insurance) from all general insurance regulations, including the Trade Practices Act. Their argument is based upon Section 13 of Title 28A (provisions relating to a particular kind of insurance shall prevail over provisions relating to insurance generally) and Section 253 of Title 28A (charging the Alabama Commissioner of Insurance with the duty of administering rating bureau provisions applicable to other insurance companies but excepting life, accident and health and title insurance). Since the Commissioner of Insurance (so plaintiffs reason) is not charged with the duty of administering laws pertaining to rating systems for title insurance (or for life or health and accident insurance) he has no authority to enforce the unfair methods of competition provisions of the Trade Practices Law against such companies. This Court finds it impossible to accept this view. Section 250 et seq., providing for rating organizations for certain types of insurance, must be construed *in pari materia* with Section 227 et seq., the Trade Practices Law. When the rate bureau system was first established by the predecessor to Section 250 et seq., of Title 28A (Title 28, Section 355 et seq.) the administration of "all laws now relating, or hereafter relating, to insurance rates and rating systems" was a responsibility of the Bureau of Rates and not of the Superintendent of Insurance. There is nothing to suggest that when the Trade Practices Law was enacted in 1957 it was intended that the Superintendent of Insurance was not charged with enforcing its provisions against all insurance companies subject to his control without regard to whether supervised rate making procedures had been established for the particular kind of insurance. Rating bureaus represent an exception, as it were, to the prohibition, whether state or federal, against joint rate activity. That no rate bureau provisions have been made for title insurance (or for life or health and accident insurance) does not, in the opinion of this Court, mean that the provisions of the Trade Practices Act are not applicable or that the Commissioner cannot enforce those provisions against such companies. Indeed, the necessary conclusion is to the contrary. Since title insurance, as well as life and health and accident insurance, are not treated specifically with respect to the establishment of premium rates the general provisions fully apply.

Accordingly, the Court concludes that the Alabama Insurance Trade Practices Law (Title 28A, Section 227 et seq.) is fully applicable and the McCarron Act exemption from the federal antitrust laws is therefore activated. Defendants' motions are therefore granted and this action dismissed.

Done this 17th day of April, 1974.

s/Seybourn H. Lynne
Senior Judge

\* \* \*

ORDER DISMISSING THIS ACTION

(Number and Title Omitted)      (Filed Apr 17, 1974)

In conformity with the memorandum opinion of the Court contemporaneously filed herewith,

It is ordered, adjudged and decreed by the Court that this action be and the same is hereby dismissed.

Done this 17th day of April, 1974.

s/Seybourn H. Lynne
Senior Judge

GODBOLD, Circuit Judge (dissenting):

The McCarron-Ferguson Act[1] divided up the field of antitrust regulation and permitted the states to take over regulation of the insurance business by enacting their own regulatory system. Existing federal statutes[2] were not repealed

---

1. Act of March 9, 1945, c. 20, P.L. 79–15, 59 Stat. 33, as amended, 15 U.S.C. §§ 1011–1015 (1970).

2. The Sherman Act, Act of July 2, 1890, c. 647, 26 Stat. 209, as amended, 15 U.S.C. §§ 1–7 (1970); the Clayton Act, Act of October 15,

with respect to insurance. To the contrary, they were specifically made applicable in the absence of state regulation. This conditional antitrust exemption is contained in § 2(b) of the Act:

> No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance: *Provided*: That [the Sherman, Clayton, and Federal Trade Commission Acts] shall be applicable to the business of insurance to the extent that such business is not regulated by State law.[3]

In my view, a court faced with the issue of whether a claim of a § 2(b) exemption is well founded must consider not merely whether the state is regulating insurance but whether it is doing so adequately. The language of the proviso, as illuminated by the legislative history, requires such an inquiry. The proviso embodies the compromise which the Senate accepted after rejecting this section without the proviso. The Senate accepted the proviso only after being told that it carried into the Act a requirement that state legislation be adequate. This concept of adequacy is contained in the "to the extent" language in the closing phrase of the proviso. The required inquiry simply has not been made in this case. The District Court, relying upon *FTC v. National Casualty Co.*, 357 U.S. 560, 78 S.Ct. 1260, 2 L.Ed.2d 1540 (1958); *California League of Independent Insurance Producers v. Aetna Casualty & Surety Co.*, 175 F.Supp. 857 (N.D.Cal., 1959); and *Com-*

*mander Leasing Co. v. Transamerica Title Ins. Co.*, 477 F.2d 77 (CA10, 1973), all discussed, *infra*, considered that the Act renders federal antitrust law inapplicable when state legislation "generally proscribes, permits or otherwise regulates the conduct in question and authorizes enforcement through a scheme of administrative supervision." On that hypothesis it reached the generalized conclusion that Alabama "has regulated the business of title insurance within the meaning of the McCarron Act so as to render the Sherman Act inapplicable."

The McCarron Act came hot on the heels of *U. S. v. South-Eastern Underwriters Assn.*, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944), which held for the first time that insurance was commerce and subject under the Commerce Clause to federal regulation, particularly the Sherman Act. The present § 2(b) was originally submitted to each House of Congress without the proviso.[4] The Senate thought the section might be taken to mean that any state could nullify the antitrust laws (for example, by passing a law simply permitting agreements generally between insurance companies), and so amended the bill to exclude the Sherman and Clayton Acts from the operation of § 2(b) altogether.[5] That left in effect a three-year moratorium during which time the antitrust laws were suspended but after which they would apply to all insurance activities no matter what state laws provided.[6] The House passed the bill without any changes of significance for our purposes.[7]

The conference committee compromise contained the proviso now in § 2(b). This was the first time that that language

---

**3.**  15 U.S.C. § 1012(b).

**4.**  *See* S.Rept. No. 20, 79th Cong., 1st Sess. (1945); H.Rept. No. 143, 79th Cong., 1st Sess. (1945). The Senate version was printed in the *Congressional Record* on the first day of the

1914, c. 323, 38 Stat. 730, as amended, 15 U.S.C. §§ 12–27 and 44 and 29 U.S.C. §§ 52 and 53 (1970); and the Federal Trade Commission Act, Act of September 26, 1914, c. 311, 38 Stat. 717, as amended, 15 U.S.C. §§ 41–58 (1970).

Senate debate, 91 Cong.Rec. 478 (1945). The House version appears at 91 Cong.Rec. 1085 (1945).

**5.**  *See* the statements of Senators Murdock and Ferguson, 91 Cong.Rec. at 479–480, Senator O'Mahoney at 483, and Senators Taft, Ferguson and Murdock at 485 (1945).

**6.**  The version as passed by the Senate appears at 91 Cong.Rec. 488 (1945).

**7.**  91 Cong.Rec. 1093 (1945). The House debates appear at 91 Cong.Rec. 978–979, 1027–1028, 1084–1094 (1945).

guage appeared in the bill. The House passed the amended bill without discussion,[8] but the Senate debated it long and hard.[9] The first day's debate was largely concerned with what kind of state law would succeed in ousting federal jurisdiction. On the second day debate centered on the authority given states to permit activities that would otherwise be in conflict with federal antitrust laws, rating bureaus in particular. The debate the first day, pertinent here, established that only adequate state laws would oust federal jurisdiction. The debate concluded when Senator McCarron confirmed that federal law could not be easily put aside by the States:

> Senator Barkley: I should like to ask, in this connection, whether, where States attempt to occupy the field— but do it inadequately—by going through the form of legislation so as to deprive the Clayton Act, the Sherman Act, and the other acts of their jurisdiction, it is the Senator's interpretation of the conference report that in a case of that kind, where the legislature fails adequately even to deal with the field it attempts to cover, these acts still would apply?

> Senator McCarron: That is my interpretation.

91 Cong.Rec. 1444 (1945). The complete day's debate is printed as an appendix to this opinion.

This approval by the Senate of the conference committee compromise culminated two years of sharp difference with the House. The Senate earlier had declined to act on proposals that would exempt the insurance industry from the antitrust laws.[10] The Senate finally passed the McCarron proposal, but only after amending it to ensure that, after the moratorium period, the antitrust laws applied to insurance all of the time. That bill emerged from the conference committee with the compromise that resurrected the exemption where the states themselves were regulating insurance. The Senate accepted it only after receiving clarification that not just any state law would oust federal jurisdiction. The federal laws were to remain in effect in a state unless the state enacted "adequate" regulation.

This is also the view that President Franklin D. Roosevelt took of the Act. When he signed the bill into law he stated that the antitrust laws would apply to insurance "except to the extent that the States have assumed the responsibility, and are effectively performing that responsibility, for the regulation of" insurance. Donovan, Regulation of Insurance Under the McCarron Act, 15 L. & Contemp.Prob. 473, 478, and note 25.

This test of "adequacy" is carried into the act by the "to the extent" phrase in the proviso. It requires courts to inquire into the impact of the state law, the strength of its substantive provisions and the efficacy of the procedures by which they are effected, and not merely to ascertain that some state law on the subject has been enacted.

The Supreme Court has ruled twice on the meaning of the phrase "to the extent that such business is not regulated by State law." [11] One case, *FTC v. National*

8. 91 Cong.Rec. 1395–1396 (1945).

9. 91 Cong.Rec. 1442–1444 and 1477–1489 (1945).

10. The debates in 1943 were inconclusive, although the House then, as later, seemed more inclined to grant a proposed antitrust exemption for insurance. 89 Cong.Rec. 10144–10152 and 10659–10664 (1943); and see also extensions of remarks in the Appendix of the Congressional Record, beginning at A5272, A5377 and A5683. The House passed a bill with an exemption for insurance in 1944. 90 Cong. Rec. 6417–6419, 6449–6456, 6524–6557, and 6559–6566 (1944). The bill was reported out

of committee in the Senate but died on the calendar. 90 Cong.Rec. 8054 (1944).

11. An independent line of cases deals with whether state power to regulate or tax insurance companies is impeded by the Commerce Clause. The leading cases are Prudential Insurance Co. v. Benjamin, 328 U.S. 408, 66 S.Ct. 1142, 90 L.Ed. 1342 (1946) and Robertson v. California, 328 U.S. 440, 66 S.Ct. 1160, 90 L.Ed. 1366 (1946). There is language in these opinions that the intent of Congress in enacting the McCarron Act was to give the states full use of their power in the insurance field up to the legislatively unavoidable limits of the Commerce Clause. Of course, Congress

*Casualty Co.*, 357 U.S. 560, 78 S.Ct. 1260, 2 L.Ed.2d 1540 (1958), is pertinent to our inquiry.[12] *National Casualty* is a terse per curiam opinion in which the Court ruled on two contentions of the FTC and did not rule on the problem before us. In its brief FTC phrased the question very broadly: Whether the McCarron Act ousts FTC jurisdiction "upon the mere enactment of state laws prohibiting such practices within the boundaries of the states involved." [13] The Court did not respond to that broad statement but restricted its determination to consideration and rejection of two more narrow and specific theories presented by FTC. The Court's caveat, "Petitioner does not argue that the statutory provisions here under review were mere pretense," 357 U.S. at 564, 78 S.Ct. at 1262, 2 L.Ed.2d at 1543, suggests strongly that some inquiry into adequacy is appropriate. The question is how much inquiry must there be. As discussed below, it does not seem to me that the use of the word "pretense" in a one-sentence aside explaining what the FTC was not arguing is to be enshrined as a judicial ruling that the proposition identified as not argued is adjudicated to be the governing legal standard for measuring the sufficiency of state legislation.

FTC's first theory was that because there were some interstate insurance practices which could not be reached by state law because of the bar of the Commerce Clause, Congress must have in-

tended the federal antitrust laws always to apply to the "channels of interstate commerce." This is not a convincing argument, and the Court rejected it, noting that the activities against which the FTC was proceeding in that case could be subjected to state regulation without offense to the Commerce Clause. 357 U.S. 560, 563–64, 78 S.Ct. 1260, 2 L.Ed.2d 1540, 1542–43.[14]

FTC's second theory ran this way. The statute in that case, like the one in the present case, was an enactment of the National Association of Insurance Commissioners' "Model Unfair Trade Practices Act for Insurance." It only prohibited "unfair trade practices" generally, indeed, in words almost identical to § 5 of the FTC Act, 15 U.S.C. § 45. Whether specific acts or practices fell within that rubric could only be determined after hearings. Until a hearing was held there was no specific wrong defined. The FTC argued that until the states' administrative agencies had "crystallized [the general prohibition] into 'administrative elaboration of these standards and applications in individual cases,' " there was no regulation at all. The Court rejected this on the ground that the legislative history did not support such a distinction between "regulation" and legislation."

What was not decided by the Court is made clear by the two statements—that "[p]etitioner does not argue that the

meant to permit full state regulation of insurance, but it also provided that in the absence of appropriate state legislation the federal antitrust laws would apply without additional action by Congress. What we must decide is the standard for state statutes regulating insurance under § 2(b) and whether the statute in this case meets that standard.

Another line of cases considers what activities constitute the business of insurance under § 2(b) to determine the application of other federal statutes, most notably the federal securities laws, SEC v. National Securities, Inc., 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969), and to determine whether the federal securities laws cover certain annuity contracts issued by insurance companies, SEC v. Variable Annuity Life Ins. Co., 359 U.S. 65, 79 S.Ct. 618, 3 L.Ed.2d 640 (1959); SEC v. United Ben-

efit Life Ins. Co., 387 U.S. 202, 87 S.Ct. 1557, 18 L.Ed.2d 673 (1967).

12. In the other case, FTC v. Travelers Health Assn., 362 U.S. 293, 80 S.Ct. 717, 4 L.Ed.2d 724 (1960), the Court held that by state regulation Congress meant regulation by the state in which the disputed acts took place. Thus Nebraska could not render federal laws ineffective in other states with respect to the activities of Nebraska domiciliary corporations by declaring that it was regulating the out-of-state activities of its domiciliary corporations.

13. Brief of Petitioner at 3.

14. It affirmed our holding on similar grounds in American Hosp. & Life. Ins. Co. v. FTC, 243 F.2d 719 (CA5, 1957) the companion to *National Casualty*.

statutory provisions . . . were mere pretense," and in the concluding substantive paragraph: "So far as we can determine from the records and arguments in these cases, the proviso in section 2(b) has been satisfied." The former indicates that no argument going to the quality or character of the regulations was made. The latter indicates that the Court was not going beyond its narrow rejection of the two precise arguments put forward by the FTC. In light of these statements, the Court could hardly have intended that the "mere pretense" characterization of what FTC had not argued was intended to be a definitive adjudication of the interplay between the McCarron Act and a model statute utilized in 44 states.[15]

Within a year a district court converted *National Casualty's* terse rejection of FTC's legislation-regulation distinction into a broad holding that any prohibition by the state was adequate for purposes of § 2(b). *California League of Independent Producers v. Aetna Casualty & Surety Co.*, 175 F.Supp. 857 (N.D.Cal., 1959). The opinion cited *National Casualty* for the proposition that "when a State statute generally proscribes . . certain conduct on the part of the insurance companies" there is state regulation for the purposes of § 2(b). It also said that § 2(b) is satisfied where the state statute "permits or authorizes certain conduct." 175 F.Supp. at 860. No authority was cited for this proposition, and the legislative history is replete with statements that the states could not by enacting statutes permitting certain acts or conduct render those acts or conduct immune to Sherman or Clayton prohibitions.[16]

In four cases in other circuits the courts have addressed the question of how effective statutes must be to trigger the § 2(b) exemption. In two of these cases appellants relied heavily on what the FTC had not urged in *National Casualty,* that the state statutes were "mere pretense." The argument was rejected, the courts relying in large part on the analysis in the *California League* opinion, which was erroneous in its reading of both *National Casualty* and the legislative history.

In *Ohio AFL–CIO v. The Insurance Rating Board,* 451 F.2d 1178 (CA6 1971), *cert. denied* 409 U.S. 917, 93 S.Ct. 215, 34 L.Ed.2d 180 (1972), an attack was brought on Ohio's rate-setting system, which permitted insurance companies and rating boards to file rates which would go into effect unless challenged by the commission, and for which there was no restitution even if they were subsequently determined to be excessive.[17] The court noted, 451 F.2d at 1181, that the state had a "comprehensive scheme

**15.** 357 U.S. at 565, footnote 6, 78 S.Ct. 1260, 2 L.Ed.2d at 1543.

**16.** As noted above, footnote 5, the Senate amended the original bill because it thought § 2(b) would authorize the states to sanction Sherman and Clayton violations. Its amended bill excluded the Sherman and Clayton acts from the operation of § 2(b) altogether. In the debate on the conference report Senators McCarron and O'Mahoney emphasized that only state legislation regulating insurance, not just any state legislation, would satisfy § 2(b). *See* 91 Cong.Rec. 1443 and 1444 (1945) (printed in the appendix to this opinion). Senator Pepper, in attacking the compromise, made the strongest statements concerning what the provision would permit. *See* 91 Cong.Rec. 1478, 1480, 1481, 1485 (1945). The response of Senator O'Mahoney was that the bill only authorized the states to permit what would otherwise be Sherman or Clayton violations if they used something like ICC or state public utility rate-setting mechanisms, 91 Cong.Rec. 1483 (1945), and again that it did not permit private regulation but only "public regulations written by public authority," 91 Cong.Rec. 1485 (1945). Private combinations or agreements were acceptable "provided those combinations and agreements were in the open and approved by law. Public supervision of agreements is essential," 91 Cong.Rec. 1486 (1945). He thus put content into the precise phrasing of the main part of § 2(b) that only state statutes *"regulating* the business of insurance" were covered by the section (emphasis added).

**17.** Plaintiffs raised other contentions as to the weaknesses of the statute. *See* 451 F.2d at 1180, and the opinion of Justice Douglas dissenting from the denial of certiorari, 409 U.S. at 917–918, 93 S.Ct. 215, 34 L.Ed.2d at 180–181.

for the regulation of automobile . . insurance," although it was not "as extensive or as stringent as some of the other states." It rejected the argument that the court should consider the quality of the regulatory system, *id.,* at 1183, or whether its standards or requirements had been effectively enforced *id.* at 1184. In this last point it relied for its analysis of the legislative history of the McCarron Act upon an unreported case from the Middle District of Tennessee and a 1960 report of the Senate Judiciary Committee's Antitrust Subcommittee which discussed *National Casualty, id.*[18]

In *Commander Leasing Co. v. Transamerica Title Ins. Co.,* 477 F.2d 77 (CA10, 1973), plaintiffs brought a price-fixing action against title insurance companies. In that case, unlike here, the title insurers were subject to the state rate-setting regulatory system and the state restraint of trade act contained both public injunction and private damage action remedies, *id.* at 83. The court concluded: "The 'State of Colorado has not only regulated the title insurance business, but has done so in great detail.' " *Id.* As in *Ohio AFL–CIO* plaintiff tried to save his suit by relying on the "mere pretense" phrase in *National Casualty.* The court rejected that, citing *Ohio AFL–CIO* and *Prudential Ins. Co., supra,* footnote 11, and holding that the "pretense" allegation "does not stand up when the aforementioned Colorado regulatory statutes are examined." It later said, "Our present task is to determine only whether the State of Colorado has regulated the business of title insurance, and not to determine whether this regulation could be better and more effectively done," *id.,* at 84. The court stated that it was not willing to go into an argument about whether state regulation could be done better, but it concluded that Colorado had done a great deal and that that was adequate.

Thus the first two major cases to deal with tests of the adequacy of state insurance regulation under the "mere pretense" phrase of *National Casualty* declared that the courts were not to make an inquiry into the statutes' effectiveness but nevertheless made such an inquiry. They also rejected any qualitative test of the statutes in question on the grounds that the best possible statute is not required. *Ohio AFL–CIO,* 451 F.2d at 1181, 1183; *Commander Leasing,* 477 F.2d at 83, 84. I agree that the McCarron Act does not require the best possible statute. But it does require one that is efficacious.

The next circuit case to address adequacy actually centered on a different attack, whether the regulated acts were part of the business of insurance.[19] *Travelers Ins. Co. v. Blue Cross of Western Pennsylvania,* 481 F.2d 80 (CA3, 1973). Blue Cross was charged with monopolizing the hospital insurance market by executing contracts with local hospitals. The contracts were required by the state insurance commissioner and were approved by his office prior to their taking effect. Although the court notes *Ohio AFL–CIO* and by dictum says that even ineffective and unenforced regulation ousts federal jurisdiction, it goes on to hold that Pennsylvania insurance companies were subject to "aggressive state regulation." 481 F.2d at 83.

In *Addrisi v. Equitable Life Assurance Soc. of U. S.,* 503 F.2d 725 (CA9, 1974), *cert. denied* 420 U.S. 929, 95 S.Ct. 1129, 43 L.Ed.2d 400 (1975), *reh. denied* 421 U.S. 922, 95 S.Ct. 1590, 43 L.Ed.2d 790, the plaintiff alleged that defendant used an illegal tie-in between home financing loans and cash value life insurance policies. The court's consideration of the McCarron § 2(b) issue is brief, relying wholly on *California League* and *Ohio AFL–CIO.* It observes that California has an insurance code, particularly a sec-

---

**18.** Such a quasi-legislative pronouncement, and an inaccurate one at that, is to be given little weight as a barometer of legislative intent. *See* the discussion in Mount Sinai Medical Center of Greater Miami v. Weinberger, 517 F.2d 329, 343 (CA5 1975).

**19.** *See* footnote 11, *supra.*

tion entitled "Unfair Practices." It then says that whether the conduct is permitted or prohibited is irrelevant, that § 2(b) is satisfied in either event, citing *Ohio AFL–CIO*, 451 F.2d at 1178. There is no new consideration of the legislative history and no discussion of adequacy or effectiveness or of whether the court need consider them under the § 2(b) proviso.

Of the remaining circuits, the First, Seventh and D.C. Circuits appear not to have ruled on the McCarron Act exemption. The Second and Tenth Circuits have ruled on the effect of McCarron on application of the Federal Arbitration Act to insurance contracts. It applies. *Hamilton Life Ins. Co. v. Republican Nat'l. Life Ins. Co.*, 408 F.2d 606 (CA2, 1969), and *Hart v. Orion Ins. Co.*, 453 F.2d 1358 (CA10, 1971). The Fourth Circuit, when faced with a challenge to a state's system of approving rate schedules, held that the rates were in fact set by state officials and that the antitrust laws only reached the activities of private persons so that no wrong had been done. It thus did not reach the McCarron Act question we have. *Allstate Ins. Co. v. Lanier*, 361 F.2d 870 (CA4, 1966). The Eighth Circuit's decision in *North Little Rock Transpo. Co. v. Casualty Reciprocal Exchange*, 181 F.2d 174 (CA8, 1950), is obscure at best, the appellant apparently challenging the validity of the McCarron Act itself. The court also held that the rate-setting board became an instrumentality of the state, at least for purposes of the state constitution's prohibition of monpolies. In *Travelers Health Assn. v. FTC*, 298 F.2d 820 (CA8, 1962), on remand from the Supreme Court decision in *FTC v. Travelers Health Assn., supra*, footnote 12, the court held that a state's inability to effectively reach out-of-state mail order business with no assets or employees in the state rendered such regulation not sufficient to oust FTC jurisdiction under § 2(b).

Turning to this circuit, *American Hosp. & Life Ins. Co. v. FTC*, 243 F.2d 719 (CA5, 1957), was affirmed by the Supreme Court with *National Casualty*. This court was only presented with and only ruled on the interstate commerce argument. We have gone off on various procedural or collateral issues in other McCarron Act cases.[20]

The most recent case is *Meicler v. Aetna Casualty and Surety Co.*, 506 F.2d 732 (CA5, 1975). Plaintiffs had been put into a higher risk category by their auto insurance company. Every company in the state refused to put them into the low risk classification, all pursuant to the state insurance plan which required the high risk classification because of their bad driving records. The brunt of their attack was an attempt to slip through McCarron's § 3(b), the exception for boycott, coercion and intimidation.[21] 15 U.S.C. § 1013(b). They asserted that they were being boycotted by the state insurance companies. We held that the boycott provision was aimed at such acts when used against competitors, agents, and others in the business, not ultimate consumers. The opinion also considered the regulation question somewhat more generally. Noting that the complaint was unclear on whether it meant the state's insurance companies' acts were pursuant to or in violation of the statutory rating system, it said (1) if they

---

20. *American Family Life Assur. Co. v. Blue Cross of Fla., Inc.*, 486 F.2d 225 (CA5, 1973) (monopolization charge based on Blue Cross' "coordination of benefits" provision failed because the restraint of trade was not unreasonable, so there was no antitrust violation at all); *American Gen. Ins. Co. v. FTC*, 496 F.2d 197 (CA5, 1974) (FTC sought injunction against merger of insurance companies; denial affirmed because of Commission's failure to exhaust its own administrative remedies); and *Battle v. Liberty Nat. Life. Ins. Co.*, 493 F.2d 39 (CA5, 1974), *cert. denied* 419 U.S. 1110, 95 S.Ct. 784, 42 L.Ed.2d 807 (1975), (trial court granted Rule 12(b)(6) motion; remand for more findings; record not adequate to determine whether defendants were in the business of insurance).

21. This section provides that the Sherman Act shall apply to any agreements to or acts of boycott, coercion or intimidation, the moratorium and other provisions notwithstanding.

were pursuant to the statute, then this concerted activity was at the heart of the exemption for regulation; (2) if in avoidance of it, then the acts were in violation of the state antitrust laws, which regulated such conduct. The opinion does not hold that adequacy is *not* an issue. *Id.*, at 734. Presumably the court felt that it did not reach the question or that the state laws were adequate. (By comparison to the Alabama statutes, the Texas laws have far stronger provisions, providing for public civil and criminal penalties.) [22]

Summarizing, I find no independent review of the legislative history of the McCarron Act since at least *National Casualty*.[23] No court, including the Supreme Court in *National Casualty*, has specifically laid out, considered and referred to the flow of legislative developments leading to the final form of the Act, or the specific debates discussed here.[24]

Although the McCarron Act turned over to the state broad authority to regulate insurance, a principal purpose of Congress was to authorize state rating systems by which the price of insurance could be set under the supervision of state officials, thus avoiding the rigors of the marketplace. The argument made to and accepted by Congress was that the character of insurance was such that competitive prices would produce financially insecure insurance companies thus undermining the essential function of insurance contracts.[25] Although Congress wished to authorize state-supervised rate-setting, it was as opposed to private price-fixing as ever.[26]

Contemporary observers assumed that the McCarron Act provided for state-supervised rate-setting and state regulation, including prohibition, of other activities within the scope of the federal antitrust laws. Most significantly this included the National Association of Insurance Commissioners, which drafted the bill that became the McCarron Act [27] as well as the model rate-regulating and trade practices acts. The Insurance Committee of the Council of State Governments, which adopted and pro-

---

**22.** The two district court cases cited by the majority do not add anything new. *Harrison v. Chicago Title Insurance Co.*, 1974–2 Trade Regulation Reports 98,022 (D.Kan.1974), reaches the same conclusion as the District Court in the present case, in almost the same language, and relying upon the same cases, *National Casualty, California League* and *Commander Leasing. Mitgang v. Western Title Insurance Co.*, 1974–2 Trade Regulation Reports 98,024 (N.D.Cal.,1974) follows *California League* from the same court in holding sufficient to create the § 2(b) exception a general antitrust law. The opinion notes, however, that California now regulates rates for title insurance by law so that "state law at present fully covers the area complained of by plaintiffs."

**23.** In that case the FTC quoted extensively from the legislative history but did not cite or rely on any of the pertinent material here discussed and included in the appendix to this opinion.

**24.** Both insurance regulators and executives read the McCarron Act in 1945, as I do now, to require that state regulation be effective if it is to render federal law inapplicable. A committee of the American Mutual Alliance reported that "regulated by state law" meant "a valid statute, or regulation having the force of law, plus a means of enforcement, which deals 'affirmatively' and effectively with the activitiy in question and under which the business is governed and directed according to stated standards." Special Committee on Legislation, American Mutual Alliance, Preliminary Memorandum Re the Effect upon the Insurance Business of the Clayton, Robinson-Patman, and Federal Trade Commission Acts (Chicago, July 15, 1945) at 5, quoted in Council of State Governments, Insurance Committee, "Revision of State Systems for Insurance Regulation: Report and Recommendations," (December 1946) at 5. The Council of State Governments' insurance committee came to the same conclusion. Revision of State Systems at 8, 12, 21–22.

**25.** *See* in particular the exchange between Senators Pepper and Ferguson in 91 Cong.Rec. 1481 (1945).

**26.** *See* in particular the comments of Senator O'Mahoney, a co-sponsor of the bill, in 91 Cong.Rec. 1480, 1483, 1485 and 1486 (1945).

**27.** *See* Revision of State Systems, supra, footnote 24, at 4. *See also* the comments of Senator Ferguson, 91 Cong.Rec. 479 (1945) and of Representative Walter, 91 Cong.Rec. 978 and 1086 (1945).

moted the NAIC proposals, took a similar view.[28] The state regulatory system contemplated by NAIC and the Council of State Governments had a state rating board system, corresponding to Sherman Act prohibitions on price-fixing, and an insurance commissioner empowered to enforce provisions analogous to the Clayton, Federal Trade Commission and Robinson-Patman Acts.[29]

This takes me to the Alabama statutes. The Alabama regulatory scheme specifically excludes title insurance from the state rate-setting system applicable to most other lines of insurance. Tit. 28A, § 253. There being no state-supervised rate-making, the defendants rely on the state law prohibiting unfair methods of competition as the regulating statute triggering the § 2(b) exemption. I need not put forward the possibility that the only type of state regulation of price-fixing that will trigger § 2(b) is a rating board system, although it is not an unreasonable argument. At least, if a statutory scheme is employed that is different from the rate-making system that Congress seemed to have in mind, it must be an adequate deterrent to price-fixing and there must be painstaking scrutiny to see if it meets that standard.

Insofar as it relates to price-fixing by title insurance companies, the overall system is a dubious one.[30] As just discussed, the rate-setting mechanism Alabama utilizes for most lines of insurance, Tit. 28A, §§ 250–313, is the kind Congress expected to have instituted, and perhaps required, but it does not apply to title insurance, § 253. And, as discussed below, the other part of the regulatory system here pertinent, and the only part that applies to price-fixing by title insurers, was designed to meet only the farther reaches of unfair competition and trade practice problems, and not the hardcore antitrust vice of price-fixing. Turning to specifics, these are some of the shortfalls:

(1) The only regulations on point are general prohibitions against any "unfair method of competition" or "unfair or deceptive act or practice" in §§ 228 and 247. These are part of the Model Unfair Trade Practices Act for Insurance, as adopted in Alabama, Tit. 28A, §§ 227–249(1). Although the Act declares unfair methods of competition and trade practices prohibited, § 228, there appears to be no direct penalty for conduct which is an unfair trade practice or method of competition. Tit. 28A, § 15, the "general penalty" section of the Insurance Code, provides criminal sanctions for willful violations of Title 28A for which no penalty is otherwise provided. Sections 243(3) and 249 enumerate unfair trade practices for which the § 15 penalty is specifically incorporated. This suggests, by negative implication, that the § 15 penalty has no application to other provisions of the Model Unfair Trade Practices Act.

(2) Price-fixing is not enumerated under the Act, so it becomes an unfair trade practice or unfair method of competition only by way of procedures specified in § 247. That section provides for notice and hearing where the insurance commissioner has reason to believe a company is engaged in an unfair trade practice. If after hearing the commissioner finds that price-fixing has occurred and that it is an unfair trade practice, he may so find, but still no

---

**28.** The insurance committee's position is contained in its Revision of State Systems, *supra*, footnote 24.

**29.** The powers granted to insurance commissions in the Unfair Trade Practices Act for Insurance were specifically designed to match the Clayton, FTC and Robinson-Patman Acts. *See* Revision of State Systems, *supra*, footnote 24, at 21–22.

**30.** The subject matter with which we are concerned is price-fixing by title insurers. In part the District Court rested its decision upon state regulation of the title insurance business in general. Regulation of other aspects of that business, however comprehensive and extensive, cannot contribute to adequacy of an antitrust regulatory system with respect to § 2(b). Congress hardly intended that state regulation of the form of policies, licensing of agents, capital structure of companies, and the like, was to have any relationship to whether federal or state law would regulate antitrust activities

penalty is provided for acts past, present or future. The company can appeal this finding to a state circuit court and thence to the Court of Civil Appeals, § 47.

(3) To get enforcement the commissioner, acting through the attorney general, must petition a state court for an injunction. But an enforcing injunction does not issue on the record of the commissioner's hearing and his findings. For good cause, the court can receive new evidence. More important, the court must consider anew whether the practice in question is unfair. The findings of the original hearing are given no particular weight.[31] If the circuit court enjoins the practice the injunction is, of course, only prospective. No act previously done is subject to penalty. A company subject to an injunction can appeal.

This procedure must be repeated for every person charged with committing an unfair trade practice. Where a different person is involved the statute contains no authority for the commissioner to bypass the § 247 hearing with respect to conduct previously held to be an unfair trade practice.

(4) There are no private actions for price-fixing in particular or unfair trade practices in general.[32]

My concern about the adequacy of this regulatory system is heightened by considering the statutory pattern from which it was drawn. The statute was part of the National Association of Insurance Commissioners' proposal, which included a statute providing for rate-setting under state supervision. The assumption of the promoters of these complementary model acts was that rate-setting would be handled under the rate-setting statute, thus triggering the § 2(b) exemption with regard to the Sherman Act. Section 2(b) would be triggered as to all other federal antitrust laws by the Unfair Trade Practices Act.[33] The Unfair Trade Practices Act was designed to supplement a rate-setting statute, just as the creation of the FTC was designed only to supplement and not to displace the Sherman and Clayton Act remedies.[34] To hold now that this statute is adequate for regulating price-fixing is to give it more deference than its drafters and promoters ever intended.[35]

Put succinctly, defendants' response is that if they have done what they are accused of doing they have violated Alabama as well as federal law, so that § 2(b) should be satisfied. In rejecting that argument for the reasons stated, I

31. Compare with this the general rule for appeals from decisions and orders of the commissioner, § 47(5), which gives prima facie effect to the commissioner's decision, presumably covering both questions of fact and conclusions of law. Such decisions can be reversed or modified only if "substantial rights" were prejudiced on a question of law, findings were contrary to the weight of the evidence, or the commissioner's action was arbitrary or capricious.

32. The courts of two other states, both of which enacted variations of the model statute here in question, have come to contrary results on the question of whether there is an implied private remedy for violations of specifically enumerated unfair trade practices. *Greenberg v. Equitable Life Assurance Society of the U.S.,* 34 Cal.App.3d 994, 110 Cal.Rptr. 470 (1973) (implied remedy); *Retail Clerks Welfare Fund v. Continental Casualty Co.,* 71 N.J.Super. 221, 176 A.2d 524 (1961) (no implied remedy); *cf., Carver v. Union Fidelity Life Ins. Co.,* 37 Ohio App.2d 100, 307 N.E.2d 265, 66 O.O.2d 170 (1973) (insurer held to contract on representations in advertisements, based in

part on policy against deceptive insurance advertising). In all three of these cases the practice complained of was specifically enumerated. Where the practice has not been determined to be an unfair trade practice, and the commissioner is specifically empowered to hold hearings and make such determinations, it is even less likely that an implied private remedy would be found.

33. Revision of State Systems, *supra,* footnote 24, at 21–22.

34. Revision of State Systems, *supra,* footnote 24, at 10–11. The Council of State Governments' committee viewed the FTC as a supplementary mechanism, and considered the Unfair Trade Practices Act as simply meeting the scope of the federal agency, *id.,* at 21. Alabama adopted this scheme as to all lines of insurance save title and accident and health. Tit. 28A, § 253.

35. As noted, *supra,* footnote 24, the Council also believed from its reading of the legislative history that state regulatory systems must be adequate to trigger § 2(b). Revisions of State Systems at 8, 12, 21–22.

am thus not troubled that defendants face liability for treble damages since they were never given reason to think what they are charged with doing was legal. That quandary might exist had defendants acted under a permissive state rating board system ·which was inadequate for its purposes. But this would appear to come within the ambit of *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), and Congress so intended.[36] See *Allstate Ins. Co. v. Lanier, supra.*

I would prefer to hold at the appellate level that the state's creaky machinery is inadequate on its face. At a minimum, I would remand the case to the District Court for consideration of the adequacy of the statutory scheme in the light of the Act, and for detailed findings. I would direct the District Court to consider on remand the extent, if any, to which the commissioner has actually utilized the meager antitrust enforcement power given him.[37]

The courts are bound to implement what Congress provided and intended by the McCarron Act. Our responsibility cannot be discharged if we insist upon blindfolding ourselves.

## APPENDIX

### CONGRESSIONAL RECORD—SENATE

Regulation of the Business of Insurance—Conference Report

Mr. McCARRON. Mr. President, I move that the Senate proceed to the consideration of the conference report on Senate bill 340, to express the intent of the Congress with reference to the regulation of the business of insurance.

The motion was agreed to; and the Senate proceeded to consider the report.

The PRESIDING OFFICER (Mr. Fulbright in the chair). The question is on the adoption of the report.

**36.** Senator O'Mahoney quoted the language of *Parker v. Brown* that states could not authorize Sherman Act violations, 317 U.S. at 351, 63 S.Ct. 307, 87 L.Ed. at 326, 91 Cong.Rec. 1480 (1945). Senator Pepper responded that *Parker v. Brown* did not involve a statute like the proposed McCarron Act, 91 Cong.Rec. 1480 (1945). Although Senator O'Mahoney did not respond to that point, his numerous references to the necessity for state supervision, see footnote 16, *supra,* make it clear that only such supervisory regulatory systems were within the scope of § 2(b). Where the wrong complained of is insurance companies' cooperation in submitting rates to a state official for approval, the *Noerr* doctrine should apply. *Eastern Railroad Presidents Conference v. Noerr Motor Freight,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464, *reh. denied* 365 U.S. 875, 81 S.Ct. 899, 5 L.Ed.2d 864 (1961).

Moreover, Congress may not have contemplated judicial review of the adequacy of state regulatory systems authorizing rate-setting otherwise in violation of federal law. On the second day of debate on the conference report the Senate considered rate-making that would otherwise be in violation of federal law, and the point reiterated by Senator Murdock in that context was that Congress always retained the power to make specific provision for insurance regulation if the states' performance were not satisfactory to it. This argument was based on § 2(b), which provides that state law shall not be invalidated by an act of Congress "unless such Act specifically relates to the business of insurance." *See* 91 Cong. Rec. at 1481, 1482 and 1484; *see* also the comments of Senators O'Mahoney and Barkley at 1486–1487 and of Senator Ferguson at 1487 (1945). The only references during this second day of debate to the "adequacy" of state regulation generally were made by Senator Barkley, 91 Cong.Rec. 1486 and 1488. In light of the emphasis in that day's debate on rate-setting otherwise in violation of the Sherman Act, I think this reference to an ultimate appeal to Congress does not negate the requirement discussed the first day that state laws prohibiting "combinations and restraints of trade," 91 Cong.Rec. 1444 (1945), must be adequate.

**37.** Plaintiffs represent to us that the commissioner has never secured an injunction against price-fixing, indeed has never cited any insurance company for price-fixing. I need not comment upon whether lack of enforcement will cause a facially effective statute not to trigger § 2(b). In this instance, where the statute is suspect if not inadequate on its face, the absence of enforcement directed against price-fixing is at least circumstantial evidence of inadequacy. In the absence of any case law on adequacy, courts will be better able to determine what statutes are adequate if trial courts compile informative records on how the various statutes have been utilized.

Mr. MURDOCK. Mr. President, will the Senator yield for a question?

Mr. McCARRON. I yield.

Mr. MURDOCK. As I understand the conference report which is now before the Senate, it provides for a 3-year moratorium, which is fixed as ending on January 1, 1948, against the invoking of the Sherman Act and the Clayton Act, and it provides that they shall again be in force after that period without any affirmative action on the part of the Congress, except as regulatory matters have been enacted by the States relating to subjects covered by those acts—

Mr. McCARRON. During the moratorium. Regulatory acts must be enacted by the several States in each of the several States. Otherwise the antitrust acts become effective after January 1, 1948.

Mr. MURDOCK. But is it not the purpose of the bill and does not the bill accomplish this—

Mr. McCARRON. It accomplishes a moratorium for 3 years against the operation of the acts mentioned, namely, the Sherman Antitrust Act, the Clayton Act, the Federal Trade Commission Act, as amended, and the Robinson-Patman Antidiscrimination Act.

Mr. MURDOCK. So that during the moratorium it is intended, is it not, that the States shall affirmatively step into the regulation of the insurance business?

Mr. McCARRON. That is correct.

Mr. MURDOCK. And it is intended that on the expiration of the moratorium the Sherman Act, the Clayton Act, and the other acts mentioned will again become effective except—

Mr. McCARRON. Except as the States themselves have provided regulations.

Mr. MURDOCK. I thank the Senator.

Mr. ELLENDER. Mr. President, will the Senator yield?

Mr. McCARRON. I yield.

Mr. ELLENDER. At the end of the 3-year period will the taxing and regulatory powers of the States be in anywise affected should the Congress not take any action at all?

Mr. McCARRON. No; they will not be affected.

Mr. ELLENDER. They will not be affected?

Mr. McCARRON. That is correct.

Mr. President, let me make one statement which I think should be placed in the Record here. It should be stated here, as it was stated in the report which went to the House, from which I read that—

It is not the intention of Congress in the enactment of this legislation to clothe the States with any power to regulate or tax the business of insurance beyond that which they had been held to possess prior to the decision of the United States Supreme Court in the Southeastern Underwriters Association case. Briefly, your committee is of the opinion that we should provide for the continued regulation and taxation of insurance by the States, subject, always, however, to the limitations set out in the controlling decisions of the United States Supreme Court, as, for instance, in *Allgeyer v. Louisiana* (165 U.S. 578); *St. Louis Cotton Compress Co. v. Arkansas* (260 U.S. 346); and *Connecticut General Insurance Co. v. Johnson* (303 U.S. 77).

That expression should be made a part of this explanation. In other words, we give to the States no more powers than those they previously had, and we take none from them.

Mr. HATCH and Mr. WHITE addressed the Chair.

Mr. McCARRON. I yield first to the Senator from New Mexico.

Mr. HATCH. I shall be glad to defer to my colleague the Senator from Maine.

Mr. WHITE. I thank the Senator from New Mexico.

Mr. President, let me ask the Senator from Nevada whether the report represents a complete agreement on the part of the conferees.

Mr. McCARRON. It does.

Mr. WHITE. Is the report signed by all the conferees on the part of the Senate?

Mr. McCARRON. Yes; it is signed by all of them.

Mr. O'MAHONEY. Mr. President, will the Senator yield?

Mr. McCARRON. I yield.

Mr. O'MAHONEY. I was going to remark that, as I listened to the Senator when he read from the committee report, I noticed that he was reading from the report of the House Judiciary Committee to the House on the occasion when the bill was reported to the House.

Mr. McCARRON. That is correct.

Mr. O'MAHONEY. Of course, the conference report has deviated from the bill which was reported by the House Judiciary Committee, so that the language the Senator has read does not in any way modify or alter any language in the conference report.

Mr. McCARRON. No; I do not intend that it should be so implied.

Mr. HATCH. Mr. President, the question I was going to propound to the Senator from Nevada arises in connection with subparagraph (b) on page 2 of the conference report, reading as follows:

(b) Nothing contained in this act shall render the said Sherman Act inapplicable to any agreement to boycott, coerce, or intimidate, or act of boycott, coercion, or intimidation.

There is no moratorium at all as to those matters, is there?

Mr. McCARRON. No; there is no moratorium at all as to them.

Mr. PEPPER. Mr. President, will the Senator yield?

Mr. McCARRON. I yield.

Mr. PEPPER. I have read hastily the conference report, but I am a little disturbed by what I have discovered in paragraph (b) of section 2. I read beginning with section 2(a):

Sec. 2. (a) The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.

(b) No act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such act specifically relates to the business of insurance: *Provided,* That after January 1, 1948, the act of July 2, 1890, as amended, known as the Sherman Act, and the act of October 15, 1914, as amended, known as the Clayton Act, and the act of September 26, 1914, known as the Federal Trade Commission Act, as amended, shall be applicable to the business of insurance to the extent that such business is not regulated by State law.

Does that mean that after January 1, 1948, the States may determine whether or not the Sherman and the other acts become applicable to the business of insurance?

Mr. McCARRON. The answer to that question is "Yes." During the 3-year moratorium the States may, if they see fit to do so, enact legislation for the purpose of regulation. If they do enact such legislation, to the extent that they regulate they will have taken the business of insurance in the respective States out from under the Sherman Anti-trust Act, the Clayton Act, and the other acts. If during the moratorium the States do not enact legislation for regulatory purposes, then on January 1, 1948, the Sherman Act, the Clayton Act, and the other acts will become immediately applicable.

Mr. PEPPER. Mr. President, does that not necessarily mean that we would give to the several State legislatures power, the character and outlines of which we do not define, to determine whether a Federal law enacted for the protection of all business and against all kinds of monopolies and restraints of trade shall be effective in the American Union?

Mr. McCARRON. The bill does not go that far. The Senator will recall the Southeastern Underwriters case. The decision was startling. It created consternation in the insurance business because by previous decisions rendered during the past 50 years or more we were entitled to believe that the business of insurance was not to be classified as interstate commerce. The Supreme Court of the United States specifically, directly, and emphatically put it into the category of interstate commerce. It put it squarely under the Sherman Act, the Clayton Act, and other acts. The pending bill is for the purpose of creating a moratorium for 3 years in order that the business of insurance shall not be interfered with by any Federal power under either the Clayton Act or the Sherman Act. So during the period of moratorium the various States themselves may take steps to regulate the business of insurance.

Mr. PEPPER. Mr. President, I have one further question. While I believe that the decision of the Supreme Court was eminently correct, and that it was an example of justice too long delayed, I do not wish to see anything done which will destroy the effectiveness of that decision. If there are reasons which make proper a moratorium for 3 years under the understanding that at the end of such a period of time the Clayton Act, the Sherman Act, and the other acts shall go into effect, well and good, but, so far as I am concerned, I shall not consent to postponing until January 1, 1948, the effective date of the law, and according to the States the privilege of enacting some mild form of legislation which they may call regulatory, thereby defeating the purpose of the Supreme Court decision and defeating the act itself. Apparently the conference report goes further than I had understood it to go. It does not stop with a moratorium at the end of 3 years. At the end of 3 years the moratorium would continue if in the meantime a State had regulated the business to any extent whatever.

That would defeat the Supreme Court decision.

Mr. McCARRON. The moratorium would not be continued; but if in the meantime the States themselves had regulated the business of insurance, the Sherman and Clayton Acts and the other acts would not become effective.

Mr. FERGUSON. Mr. President, will the Senator yield?

Mr. McCARRON. I yield.

Mr. FERGUSON. I believe that a statement as to the fair construction of the act would add to the helpfulness of what the Senator from Nevada has said. There are certain things which a State cannot interfere with. It cannot interfere with the application of the Sherman Act to any agreement to boycott, coerce, or intimidate, or an act of boycotting, coercion, or intimidation.

Mr. McCARRON. Not at any time.

Mr. FERGUSON. Not at any time.

Mr. McCARRON. Nor is the control of those matters under the specified antitrust acts removed at any time.

Mr. FERGUSON. That is correct. After the moratorium has expired, if a State has not legislated on the subjects covered by the three acts to which reference has been made, those acts shall be applicable to the business of insurance. But insofar as the State is concerned which has specifically legislated on the subject, the three acts shall not apply.

Mr. O'MAHONEY. Mr. President, will the Senator yield?

Mr. McCARRON. I yield.

Mr. O'MAHONEY. I believe the Senator from Michigan went a little further than was his intention when he said that if the States have legislated certain things will take place. The bill says if the States have regulated.

Mr. FERGUSON. I had reference to legislation dealing with regulation and taxes.

Mr. O'MAHONEY. The bill attempts to provide for a moratorium. I ask for the attention of the Senator from Flori-

da in order that I may give him my interpretation of the bill.

While the Southeastern Underwriters case was pending in the Supreme Court an effort was made to deprive the court of jurisdiction by passing a bill which, in effect, provided that the Sherman and the Clayton Acts should not apply to the business of insurance in any way, shape, or form.

Mr. PEPPER. Knowing how actively the insurance companies of my State fought me because I opposed the bill, I should remember it.

Mr. O'MAHONEY. That bill was not enacted. The pending bill provides for a moratorium. It contains a declaration that for a period of time the Sherman and Clayton Acts, as well as the other acts, shall not apply.

Section 4 specifically declares that the National Labor Relations Act, the Fair Labor Standards Act, and the Merchant Marine Act shall apply. Nothing in the proposed act shall be construed to affect their application. In other words, there is a positive declaration that those three specific Federal laws which were enacted by Congress to apply to commerce apply also to insurance.

Then we have a clear recommendation of the principle of the Supreme Court decision in the Southeastern Underwriters case.

Now, with respect to the section to which the Senator himself refers, it follows the declaration in the very first section that "Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest." So now we endeavor to convey that power of regulation to the States—to recognize it, I should say, rather than convey it— to recognize as desirable the regulation.

Mr. PEPPER. Will the Senator from Nevada yield?

Mr. McCARRON. I yield.

Mr. PEPPER. Does that mean that the States can by their own laws defeat the applicability and operation of the Sherman Antitrust Act and the Clayton Act?

Mr. O'MAHONEY. I think the answer to that question will be clear when I point out that there are certain agreements which can normally be made in the insurance business which are in the public interest, but which might conceivably be a violation of the antitrust law, which prohibits combinations and agreements in restraint of trade.

Mr. PEPPER. Would it not be better that those agreements, if there are such that are legitimatized, be identified in the statute?

Mr. O'MAHONEY. I quite agree with the Senator, and I endeavored to the very best of my ability to induce the committees of Congress to write into the law specific exemptions from the antitrust law, but I was unable to prevail in the Committee on the Judiciary and I was unable to prevail on the floor of the Senate. But now we have this declaration that with respect to these particular acts, the Sherman Act, the Clayton Act, the Federal Trade Commission Act, no act of Congress shall be construed to invalidate the law of any State passed for the regulation or the taxing of the business of insurance, and then the proviso.

Mr. PEPPER. Will the Senator read the proviso?

Mr. O'MAHONEY. It provides that after January 1, 1948, these several acts—

Mr. PEPPER. That is, the Sherman Act and the Clayton Act.

Mr. O'MAHONEY. Yes. They "shall be applicable"—there is a positive declaration—"to the business of insurance to the extent that such business is not regulated by State law," as was stated by one of the House Members of the conference committee. I interpret that to be a clear statement that if the States do not regulate, the power of Congress to regulate is clearly enunciated. I do not con-

ceive this to be a grant of power to the States to authorize by permissive legislation obviously adverse combinations which would be against the public interest.

Mr. PEPPER. Am I correct in saying that under the proviso which the Senator has just read, if a State made it an offense, under the laws of the State, to engage in combinations in restraint of trade, the Sherman Antitrust Act could not apply to combinations and restraints of trade by companies engaged in business in that State? Is not that what it means?

Mr. O'MAHONEY. No; I think that, for example, a rating bureau, formerly agreement among insurance companies, under the supervision and regulation of the State, would be permitted.

Mr. PEPPER. That may relate to the getting together and filing of proper data and obtaining certain statistical information and disseminating it, and all that, but the legal effect of the proviso which the Senator has just read is that a State can absolutely prevent the applicability of the Sherman Antitrust Act and the Clayton Act to insurance companies doing business in the State by passing a State act which will make combinations and restraints of trade unlawful in that State. As a practical matter, we know that the States cannot and will not enforce these laws against these insurance companies.

·Mr. WHITE. Mr. President, is it not perfectly clear that the force and effect of these Federal statutes may be applicable and shall be applicable to whatever extent the State law fails to occupy the ground and engage in regulation? As I take it, there are two jurisdictions.

Mr. McCARRON. There always are.

Mr. WHITE. There is the State, authorized to act to whatever extent seems proper.

Mr. McCARRON. That is correct.

Mr. WHITE. Then the Federal Government can come in, and it does come in and may legislate beyond the limit of the State legislation.

Mr. McCARRON. To the extent that the State does not regulate.

Mr. WHITE. To the extent that the State does not regulate.

Mr. MURDOCK. Mr. President, does the Senator from Maine take the position that, under the conference report, it becomes necessary for the Congress to act again affirmatively, subsequent to any State action taken?

Mr. WHITE. Not at all; that is not my view of the matter at all. My view is that the State may regulate. If, however, the State goes only to the point indicated, then these Federal statutes apply throughout the whole field beyond the scope of the State's activity.

Mr. McCARRON. That is a correct statement.

Mr. MURDOCK. Without any subsequent action on the part of Congress?

Mr. WHITE. Without any subsequent action on the part of Congress.

Mr. MURDOCK. I think that therein lies a very important feature of this whole matter. I agree thoroughly with the Senator from Maine that insofar as the States step into the picture affirmatively and act by regulation, they may do so. As the Senator from Wyoming has said, we convey no authority, we simply recognize their right to regulate. Insofar as they fail to cover the same ground covered by the Sherman Act and the Clayton Act, those acts become effective again.

Mr. BARKLEY. Mr. President, will the Senator yield?

Mr. McCARRON. I yield.

Mr. BARKLEY. I should like to ask, in this connection, whether, where States attempt to occupy the field—but do it inadequately—by going through the form of legislation so as to deprive the Clayton Act, the Sherman Act, and the other acts of their jurisdiction, it is the Senator's interpretation of the conference report that in a case of that kind,

where the legislature fails adequately even to deal with the field it attempts to cover, these acts still would apply?

Mr. McCARRON. That is my interpretation.

Mr. PEPPER. Mr. President, I wish to address myself to the report before it is acted on, and I should appreciate very much if it might be allowed to go over so that I would have that opportunity. At the present time I am not disposed to let the matter go through without addressing myself to it.

The PRESIDING OFFICER. The question is on agreeing to the conference report.

Mr. PEPPER. Mr. President, I wish to address myself to the subject, then, and I shall simply have to delay the Senate, because I wish to discuss the report. I shall be frank; I think the conference report bill practically destroys the effect of the Supreme Court decision, and I am against that. At least I wish to have time to go into it. I do not know of any emergency which requires that the report be agreed to this afternoon. I should appreciate the privilege of considering the matter a little.

Mr. McCARRON. The Senator is correct regarding the 3-year moratorium, but beyond that he is in error.

Mr. PEPPER. I would not expect Senators, even if they had the power, to change the report on the floor, and I am perfectly willing to have provided a 3 or 4 or 5 year moratorium, but I am not willing to see the decision of the Supreme Court emasculated. I wish to study the matter before I can give my consent to it. Otherwise, I certainly wish to address myself to it.

Mr. McCARRON. Just one question to the Senator, then I shall yield and the conference report may go over, so far as I am concerned. Does the Senator oppose State regulation of insurance?

Mr. PEPPER. I do not oppose State regulation which is not inconsistent with the operation of the Sherman antitrust Act and the Clayton Act. On matters of taxation, general regulation, and all that sort of thing, I think the States should regulate, but I think that now that insurance has been brought, by the decision of the Supreme Court, up to the bar of the Clayton Act and the Sherman Act, we should not give the insurance companies immunity from the applicability of those acts.

Mr. McCARRON. I am willing that the matter should go over, but I should like to call it up tomorrow.

Mr. PEPPER. That is all right. I appreciate the Senator's consideration.

The PRESIDING OFFICER. Without objection, the consideration of the conference report will go over.