CRAVER, APPELLEE, *v.* UNION FIDELITY LIFE INS. CO., APPELLANT.

(No. C-73204—Decided October 29, 1973.)

Mr. Arnold I. Swartzman and Ms. Eugenia Hauber, for appellee.

Mr. Robert G. McIntosh, for appellant.

PALMER, J. This appeal arises from an action filed by plaintiff-appellee against the defendant-appellant insurance company for a declaratory judgment pursuant to R. C. 2721.03, praying for a declaration that the policy of insurance and rider issued by defendant to plaintiff required defendant to pay hospital benefits of $100 per week to plaintiff beginning with the first day of hospital confinement of plaintiff's wife after the effective date of the policy, and for damages to which he was entitled upon defendant's refusal to pay such benefits. Following the completion of discovery procedures and the overruling of plaintiff's motion for summary judgment, the matter proceeded to trial to the court, without a jury, pursuant to certain stipulations of fact involving, *inter alia*, the admission into evidence of a certain advertising brochure published by defendant in local newspapers by means of which defendant solicited plaintiff's application for insurance which, upon acceptance, ripened into a contract of insurance between the two parties, and of the contract of insurance and surgical rider thereto issued to plaintiff subsequent to his application, one clause of which, under the heading "Definitions," provided the following:

" 'Sickness' means sickness or disease resulting in hospital confinement where such sickness or disease is first

manifested after the Effective Date of the Policy and while the Policy is in force."

It was further stipulated that plaintiff's wife was confined in a hospital for a period of 28.14 weeks after the effective date of the policy and that the defendant paid plaintiff $500 for five weeks of such confinement but refused to pay for the balance of 23.14 weeks which, it was stipulated, was occasioned by sickness or disease antedating the effective date of the policy.

Following a brief trial consisting solely of the above and other stipulations not relevant herein, and of the testimony of the plaintiff, the court submitted the matter and in due course announced its opinion (see 35 Ohio Misc. 15) setting forth in detail its findings and conclusions, and directing the presentation of a judgment entry, subsequently journalized, granting judgment for plaintiff in the sum of $2,314. From this judgment defendant appeals, asserting a single assignment of error that the judgment of the trial court was contrary to law and was against the manifest weight of the evidence.

Defendant directs its principal arguments in opposition to the two reasons announced by the trial court in its opinion in support of its judgment. These reasons were summarized by the court as follows:

"For the two reasons set out: (1) that the contract is ambiguous and the ambiguity must be interpreted against the company, and (2) even if the contract be interpreted to exclude the illness of plaintiff's wife due to pre-existing conditions, plaintiff was induced to enter into the contract by false representations * * *."

Defendant argues that, contrary to the trial court's finding, the contract provision in question (defining a "sickness" covered by the policy as one which "is first manifested after the Effective Date of the Policy," a provision admittedly read by the plaintiff after a receipt by him of the policy) is clear and unambiguous, and may be relied upon by defendant to exclude plaintiff's right to recover for those expenses of his wife's confinement resulting from her sickness or disease antedating the effective date of the policy.

While it may be said that we have experienced difficulty in following the somewhat exiguous basis advanced for a finding of ambiguity in the above definition, yet we find it unnecessary to decide this issue, since it is clear to us that there is substantial and credible evidence of probative value in the record to sustain the finding of the trial court that plaintiff was induced by defendant to enter into the contract by means of false representations contained in the advertising brochure. The trial court set forth at some length, in its learned opinion, those aspects of the eight page, illustrated, and colored brochure which were obviously designed to attract the naive and unskilled, and the small-print caveats therein by which the defendant proposed to escape the consequences of its deceptive and misleading advertising. Thus, on the first page of the brochure, in varying styles and oversized type, appeared, in part, the following:

"Now * * * for people of all ages, learn how YOU CAN LEAVE THE HOSPITAL WITH EXTRA CASH IN YOUR POCKET! YOU GET $100.00 A WEEK whenever you go to the hospital!

At last, here is a plan that actually pays you: EXTRA CASH up to $10,000.00. EXTRA CASH from the first day in the hospital. EXTRA CASH to use as you see fit. EXTRA CASH in addition to hospitalization, Medicare, or any other insurance!"

Also on the first page appeared the following:

"Now * * * and only until the date shown above * * * You can have CASH protection regardless of your age or the size of your family."

On the second page, under the headline "YOU GET $100.00 A WEEK TAX-FREE," appears a photograph of of a handsome young couple enjoying, with their two children, a picnic on the shores of a lake, and under this idyllic pastoral scene, the legend in large type:

"NOW * * * you and your family can join this Extra Cash Income Plan with * * * no red tape * * * no questions to answer * * * no age limit * * * without having to see a salesman * * * without any qualification whatsoever."

Under this, in smaller type, appears a paragraph call-

ing attention to the catastrophic nature of many hospital expenses, which concludes:

"Wouldn't it be comforting to know these financial problems could be solved by your Extra Cash Plan? This Plan gives you tax-free EXTRA CASH from the first day in the hospital for up to 100 full weeks."

On the third page of the brochure, in large type and in columnar style, appears the following:

"You can be secure, knowing that when hospitalization is necessary, you will receive: $100.00-a-week TAX FREE when you go to the hospital; $100.00-a-week from the first day in the hospital; $100.00-a-week sent directly to you * * * not doctor or hospital."

Not until the fifth page of the brochure, and in the smallest type yet used, does the following appear:

"THESE ARE THE ONLY EXCLUSIONS! The *new* Union Fidelity 'Extra Income Hospital Plan' has NO WAITING PERIODS. It covers you immediately for every kind of sickness and accident except, of course, hospitalization caused by mental disorders; act of war; pregnancy, childbirth or miscarriage; or care provided in a government hospital. What's more, if you've been sick before, or if you are sick now, you'll be covered even for this condition after your policy has been in effect for only 2 years. EVERYTHING ELSE IS COVERED."

On the sixth and seventh pages are listed "18 Important Questions and Answers," several of which are stated as follows:

"2. When will my hospitalization benefits start? The day you enter the hospital.

"4. Does this policy have any 'waiting periods' before I can use it?

"No. It will go into force on the same day we accept your completed Enrollment Form and $1.00 premium for the first month's coverage.

"7. Suppose I collect benefits for a certain sickness or accident. What happens if I am hospitalized again for the same condition?

"You go back to collecting your $100.00 a week until you've been hospitalized for a total of 100 weeks and have

collected $10,000.00. Then, if the same condition puts you back in the hospital after you've resumed your normal activities for six months, you become eligible to receive $100.00 a week again, for up to 100 additional weeks. Any new condition will be covered immediately, of course.

"12. What is not covered by this policy?

"The only conditions not covered are hospitalization caused by mental disorders; act of war; pregnancy, childbirth or miscarriage; or care provided in a government hospital. You are even covered for any chronic ailment or pre-existing condition after your policy has been in force for only two years. Everything else is covered."

The final page contained the "Official Enrollment Form" by which the interested reader makes application to the insurer in a business reply envelope attached.

After a careful reading of this brochure, both in its several parts and as an entity, we find no reason to disagree with the findings of the trial court with respect to the dominant theme and overall effect of this solicitation, or in its conclusions drawn therefrom. We note, in addition, that the public policy of this state has set its face against misleading or deceptive advertising in the solicitation of insurance. See, for example, R. C. 3901.21(A), 3901.24, and 3923.16.

It seems clear to this court that where a health and accident insurer engages in a plan of solicitation by means of advertising in public newspapers of general circulation, without the intervention of agents, and without physical examinations or medical statements as a condition of the issuance of insurance or of coverage, but where the policy is put into effect by the application of the insured on a form attached to the advertising solicitation and the payment of a premium, and where it is obvious the solicitation is intended to and does in fact induce the reader to apply for and secure the policy of insurance, the insurance company is bound by any representations, promises, warranties or undertakings contained in such solicitation. *Central Casualty Co.* v. *Fleming*, 22 Ohio App. 129. *Barth* v. *State Farm Fire and Cas. Co.*, 214 Pa. Super 434, 257 A. 2d 671; *Lawrence* v. *Providential Life Ins. Co.*, 238 Ark. 981, 385 S. E.

2d 936; *Providential Life Ins. Co.* v. *Clem*, 240 Ark. 922, 403 S. W. 2d 68.

It seems equally clear that when determining the meaning, intent, or effect of the language of this type of solicitation, such shall be determined according to the understanding of the audience to which it is directed, and where the dominant theme of such advertising, constantly and prominently repeated, is that the insured is immediately covered upon payment of his initial premium "without any qualification whatsoever" and is intended to be so understood by the person who reads it, the fact that one or more caveats may be found inserted within the copy which would or could be read by a sophisticated or suspicious reader to limit or qualify the extent or immediacy of coverage does not necessarily alter or erase the dominant theme of the solicitation, or the overall meaning, intent, and effect of the language therein to the average reader. *Fritz* v. *Old American Ins. Co.* (D. C. Tex.), 41 U. S. L. W. 2447; *Mohan* v. *Union Fidelity Life Ins. Co.*, 207 Pa. Super 205, 216 A. 2d 342.

And lastly, we find that where there is competent evidence from which the trier of facts may conclude that such dominant theme of the advertising solicitation constituted a representation of a matter of fact material to the transaction, which representation was false and was made with knowledge of its falsity, and with intent to induce reliance thereon, and which, in fact, was relied upon by the plaintiff to his injury, a trial court does not err in granting judgment to a plaintiff. *United States* v. *Sylvanus* (C. A. 7), 192 F. 2d 96; 1 Couch on Insurance 2d, Section 4:42 (1959).

The judgment of the Court of Common Pleas of Hamilton County is affirmed.

*Judgment affirmed.*

HESS, P. J., and SHANNON, J., concur.