**Dale M. WINNINGHAM, Plaintiff,**

v.

**Robert B. SEXTON, et al., Defendants.**

**No. C–1–91–447.**

United States District Court,
S.D. Ohio, W.D.

April 29, 1993.

See also 812 F.Supp. 1460, 809 F.Supp. 546.

James Burdette Helmer, Jr., Helmer, Lugbill & Whitman Co., Cincinnati, OH, Meredith Lynn Lawrence, Lawrence & Schletker, Covington, KY, for plaintiff.

Frederick Mason Morgan, Jr., Montgomery, Rennie & Jonson, Arthur Herbert Schlemmer, Barron, Peck & Bennie, John Charles Scott, Faulkner & Tepe, Philip John Marsick, Jr., McCaslin, Imbus & McCaslin, Todd Matthew Powers, Rendigs, Fry, Kiely & Dennis, Cincinnati, OH, for defendants.

## ON MOTIONS FOR SUMMARY JUDGMENT AND NEW TRIAL

SPIEGEL, District Judge.

This matter is before the Court on the Plaintiff's Motion for a New Trial (doc. 265), North American Resources Corporation's ("NARC") Response (doc. 269), the Plaintiff's Reply (doc. 276), the Plaintiff's Motion for Summary Judgment (doc. 280), the Supplemental Defendant Insurance Company of North America ("INA") and Neare, Gibbs & Company's ("Neare, Gibbs") Motion for Summary Judgment (doc. 286), the Plaintiff's Reply (doc. 287), INA's Reply (doc. 290), and the parties' Stipulation of Clarification (doc. 292).

The primary issue before the Court is whether INA and Neare, Gibbs are liable on the insurance policy they issued to NARC.

## BACKGROUND

The Plaintiff, Dale Winningham, worked at North American Terminals as a laborer who unloaded cargo from barges and rail cars. On April 28, 1988, Mr. Winningham assisted in unloading a barge docked on the Ohio River at 3291 Southside Avenue. Mr. Winningham then unloaded coal from railroad boxcars on the north side of the property. Once the rail cars were unloaded, Mr. Winningham helped in moving an eighty foot conveyer from the north side of the property back down to the river.

While Mr. Winningham helped move the conveyer across 3291 Southside Avenue, the conveyer became entangled with a quadraplex wire. Upon the instructions of his supervisor, Mr. Winningham shinnied up the conveyer to untangle the wire. While on the conveyer, Mr. Winningham contacted both the quadraplex wire and a Cincinnati Gas & Electric high-voltage line. As a consequence, Mr. Winningham suffered severe

shock and extensive burns resulting in the amputation of both of his arms.

Mr. Winningham's accident occurred at 3291 Southside Avenue. The legal title to 3291 Southside Avenue was held by Cincinnati Autoshredders ("CAS"), which was composed of two general partners, Mose Cohen and Sons and I. Deutch & Sons. In 1985, however, CAS entered into an installment land contract with NARC to sell 3291 Southside Avenue. The installment land contract provided that title would pass from CAS to NARC when NARC made its final payment on the purchase price, which was anticipated to be in 1987.

Under the installment land contract, both CAS and NARC retained rights and responsibilities over 3291 Southside Avenue. One of the responsibilities covered under the installment land contract was the duty to provide insurance. In the contract, NARC agreed to maintain specific types of insurance, as follows:

> Buyer [NARC] covenants that from and after the date hereof it will keep the Property and occupiers thereof insured against the perils of fire and extended coverage, and the perils of public liability and property damage under standard policies with insurers reasonably satisfactory to Seller. . . .
>
> Buyer shall also carry public liability and property damage insurance in limits of not less than One and one-half Million ($1,500,000.00) Dollars per occurrence, and One and one-half million ($1,500,000.00) Dollars for property damage. . . .
>
> Buyer shall also purchase at its expense and maintain an Ocean Marine policy or Wharfinger policy with provisions acceptable to Seller [CAS] which shall protect Buyer and Seller from any and all liability arising in or related to usage of the docks on the subject property for loading and unloading. Said policy shall be for not less than Three Million ($3,000,000.00) Dollars.

Supplemental Defendant's Motion for Summary Judgment, doc. 286, Wetterich Aff., exh. 1, at ¶ 8, at 5–7.

To fulfill the insurance requirements of the installment land contract, John Wetterich, President of NARC, contacted John Iori, head of the Iori Insurance Agency. In order to help determine NARC's needs for insurance, Mr. Iori reviewed a copy of the CAS–NARC installment contract. Mr. Iori concluded that NARC needed two types of liability coverage—comprehensive general liability insurance ("CGL") insurance, and "wharfinger" insurance to cover "any and all liability arising in or related to usage of the docks. . . ." *Id.* Mr. Iori and Mr. Wetterich agreed that the two policies would be obtained, and that each would be distinct from the other.

Acting on behalf of NARC, Mr. Iori obtained a CGL policy from United States Fidelity & Guaranty Company ("USF & G"). Among other protections, USF & G's policy provided general liability coverage for bodily injuries occurring at 3291 Southside Avenue. However, the USF & G policy specifically excluded injuries occurring on "watercraft" and "[p]roperty while waterborne."

Because of this exclusion in USF & G's policy, NARC purchased a policy from INA through their agent Neare, Gibbs.[1] This wharfinger policy, which is the focus of this case, covered the following:

> A. This insurance covers the legal liability of the Assured for loss or damage to any vessels and equipment, cargos, freights and other interests **on board,** which are in the care, custody or control **at or in the vicinity** of the Assured's landing(s) on the:
>
> Ohio River at Mile 474.6.
>
> B. This insurance also covers the legal liability of the Assured for loss or damage to property other than that referred to in paragraph A, hereof caused by said vessels and their cargoes which are in their care, custody, or control, or for loss of life or personal injury if arising out of **only those operations covered above.**

Supplemental Defendant's Motion for Summary Judgment, doc. 286, Wetterich Aff., exh. 3, at 1 (emphasis added). Both Mr. Iori and NARC believed that the wharfinger poli-

---

1. The Court will refer to this policy as the "INA     policy."

cy and the Neare, Gibbs policy "did not overlap at all. That is, anything covered by one, was not covered by the other." Aff. of John Wetterich, ¶ 9, Aff. of John Iori, ¶ 7 (attached as exhibits to doc. 286).

On June 29, 1992, the jury found that NARC and CAS had both acted negligently. Specifically, the jury determined that the percentage of negligence attributable to NARC was 84% and the percentage of negligence attributable to CAS was 16%. The jury further found that the total damages suffered by the Plaintiff was $1,925,000. As a result of the jury's findings, this Court entered Judgment on June 30, 1992.

On June 29, 1992—immediately after this Court announced the jury's verdict—INA and Neare, Gibbs filed a declaratory judgment action in state court. INA and Neare, Gibbs asked the state court to declare that they were not liable to Mr. Winningham under their insurance contract with NARC. The state court stayed the proceedings in that court in order to allow this Court to decide whether the Supplemental Defendants are liable to Mr. Winningham under their insurance policy.

## STANDARD OF REVIEW

The narrow question that we must decide on a motion for summary judgment is whether there exists a "... genuine issue as to any material fact and [whether] the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The Court cannot try issues of fact on a Rule 56 motion, but is empowered to determine only whether issues exist that should be tried. *In re Atlas Concrete Pipe, Inc.*, 668 F.2d 905, 908 (6th Cir. 1982).

The moving party "has the burden of showing *conclusively* that there exists no genuine issues as to a material fact and the evidence together with all inferences to be drawn therefrom must be read in the light most favorable to the party opposing the motion." *Smith v. Hudson*, 600 F.2d 60, 63 (6th Cir.) (emphasis in original), *cert. dismissed*, 444 U.S. 986, 100 S.Ct. 495, 62 L.Ed.2d 415 (1979). Moreover, "while the movant's papers are to be closely scrutinized, those of the opponent are to be viewed indul-

gently." *Id.* 600 F.2d at 63. "[T]he District Court [is] obligated to consider not only the materials specifically offered in support of the motion, but also all 'pleadings, depositions, answers to interrogatories, and admissions' properly on file and thus properly before [the] court." *Id.* (quoting Rule 56(c), Fed.R.Civ.P.).

Summary judgment "must be used only with extreme caution for it operates to deny a litigant his day in court." *Id.* The Supreme Court elaborated upon this standard, in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), as follows:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial....

*Id.* at 322, 106 S.Ct. at 2552. Summary judgment is not appropriate if a dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Nevertheless, conclusory allegations are not sufficient to defeat a motion for summary judgment. *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1162 (6th Cir.1990).

## DISCUSSION

### The Plain Language of INA's Insurance Contract

The issue before the Court is whether the Supplemental Defendants are liable to Mr. Winningham under their wharfinger insurance contract with NARC. In interpreting the language of an insurance policy, courts should effectuate the intent of the parties. *Skivolocki v. East Ohio Gas Co.*, 38 Ohio St.2d 244, 67 O.O.2d 321, 313 N.E.2d 374 (1974). In attempting to fulfill this duty, courts presume that the plain meaning of the insurance contract reflects the parties' intent. *Id.* Thus, courts should read and interpret an insurance contract as would an average

person. *Craver v. Union Fidelity Life Ins. Co.*, 35 Ohio Misc. 15, 64 O.O.2d 147, 298 N.E.2d 918, *aff'd* 37 Ohio App.2d 100, 66 O.O.2d 170, 307 N.E.2d 265 (Hamilton Cty. 1973). In the case before the Court, both parties contend that the language of the INA insurance policy is clear. The parties, however, disagree vehemently over what the INA insurance policy clearly states.

■ By its very nature the English language contains a certain amount of ambiguity. *See generally,* James Bond White, *When Words Lose Their Meaning* (1984). Words, let alone sentences, can have different meanings. Paul Bergman, *Ambiguity: The Hidden Hearsay Danger Almost Nobody Talks About,* 75 Ky.L.J. 841, 852 (1986) (discussing lexical ambiguity where a word has many meanings, and structural ambiguity where a sentence can have numerous meanings). Still, the difficulties experienced in attempting to be precise when using the English language do not mean that the courts should automatically find contracts or statutes to be ambiguous. *See generally, Mellon Bank, N.A. v. Aetna Business Credit, Inc.,* 619 F.2d 1001 (3d Cir.1980) (discussing at length how courts should analyze contractual language). In fact, most words, sentences, and documents have a plain meaning. *But see* Stephen Brainerd, *A Symposium of Critical Legal Study: The Groundless Assault: A Wittgensteinian Look At Language, Structuralism, and Critical Legal Theory,* 34 Am. U.L.Rev. 1231 (Summer 1985) ("Critical Legal Studies (CLS) has effectively drawn all forms of discourse that claim the support of a single, prioristic 'rationality' into an uncomfortable light—a light that reveals the pale and confused concept of reason squirming to crawl back into the well shaded crevasses of 'the way things should be.' ").

■ We now turn to the plain meaning of INA's insurance policy. Under its installment land contract with CAS, NARC purchased a "wharfinger policy." According to the dictionary, "wharfinger" can be defined as "one who owns or has charge of a ... structure built on the shore of or projecting into a harbor, stream, etc." *The Random House Dictionary of the English Language,* at 1625 (Unabridged Ed.1979). In their wharfinger policy, INA covered property damage to "vessels and equipment, cargoes, [and freights]." INA also covered "other interests on board, which are in the care, custody, or control at or in the vicinity of the Assured's landing(s) on the Ohio River at Mile 474.6." We are unsure what constitutes "other interests;" however, this ambiguity is unimportant because any of the "other interests" must be *on board.*[2]

Mr. Winningham was not injured on board. In fact, he was injured 75 to 100 yards from the water. In response, the Plaintiff points to the language "at or in the vicinity." Mr. Winningham contends that his injury took place within the vicinity of NARC's landing on the Ohio River at Mile 474.6. In making this argument, he ignores the key word "which." The INA insurance policy only covers "other interests on board, *which* are ... at or in the vicinity...." (emphasis added). Because of the word "which," the "at or in the vicinity" language limits the types of "interests on board" covered under the insurance policy. *See generally, Bowsher v. Merck & Co.,* 460 U.S. 824, 833, 103 S.Ct. 1587, 1593, 75 L.Ed.2d 580 (1983) (noting that in statutory construction, a court should consider every word of the statute). Thus, a personal injury claim "at or in the vicinity" of NARC's landing on the Ohio River at Mile 474.6 is only covered if it is "on board."

■ Mr. Winningham also argues that INA's insurance policy applies to his claim because his injuries arose out of NARC's operations at 3291 Southside Avenue. INA's insurance policy covers "loss of life or personal injury if arising out of only those operations covered above." The Plaintiff focuses upon the word "operations," and argues that this word broadens the coverage of the policy to include his personal injury claim. However, in making this argument, the Plaintiff ignores that "operations" are "only" covered under the insurance policy if they have been "covered above" in Paragraph A. As dis-

---

**2.** We do know that the INA insurance policy does cover certain personal injury claims. Paragraph B states that "[t]his insurance also covers the legal liability ... for loss of life or personal injury if arising out of only those operations covered above."

cussed earlier, Paragraph A limits coverage to property damage for various goods and to "other interests on board." Therefore, INA's insurance policy does not cover Mr. Winningham's personal injuries because they did not occur "on board."

■ The Plaintiff also offers a third argument. Before this case was transferred to this Court, Judge Bertelsman found that Mr. Winningham was a longshoreman as a matter of law. Order, January 22, 1991 (doc. 41). Congress has provided that a person is entitled to coverage under the Longshoreman's and Harbor Worker's Compensation Act ("LHWCA") if that person has worked in areas customarily used in loading, unloading, repairing or building a vessel. *See* 33 U.S.C. § 903(a) (1992). Mr. Winningham contends that because he is a longshoreman, he "also satisfies the coverage provisions of the Neare, Gibbs/INA insurance policy which provides coverage for injuries arising out of operations involving vessels and equipment cargos, freights and other interests on board occurring at or in the vicinity of NARC's landing." Plaintiff's Reply, doc. 287, at 8.

The Plaintiff's contention fails on two fronts. First, the statutory provision underlying the Plaintiff's argument concerns when a maritime employee is covered under the LHWCA. *See* 33 U.S.C. § 903(a). Thus, the statute does not define a longshoreman; rather, the statute describes which maritime employees are entitled to federal protection. More importantly, Mr. Winningham's argument mixes apples and oranges. The fact that Mr. Winningham was working as a longshoreman is in no way indicative of whether INA's insurance policy covers his injury. INA and NARC agreed to their own private contract without reference to the LHWCA. Congress established its public statute without reference to contracts like the one between INA and NARC. As a result, Mr. Winningham's status as a longshoreman has no relevance to the issue of whether INA is liable under its insurance policy.

In sum, the plain language of INA's wharfinger policy excludes coverage for Mr. Winningham's injuries, because he was not on board a vessel in the vicinity of NARC's landing on the Ohio River at Mile 474.6.

## Extrinsic Evidence Surrounding INA's Insurance Policy

■ Out of an abundance of caution, for this portion of our decision, we shall assume that the contractual language in NARC's insurance policy is ambiguous. In ambiguous insurance contracts, courts have established two methods of analysis: (1) interpret the contract against the drafting party—the insurance company—*see e.g., Blohm v. Cincinnati Ins. Co.,* 39 Ohio St.3d 63, 64, 529 N.E.2d 433, 434 (1988); and (2) attempt to ascertain the intent of the parties to the INA insurance contract by looking at extrinsic evidence. *See e.g., Kelly v. Medical Life Ins. Co.,* 31 Ohio St.3d 130, 132, 31 O.B.R. 289, 509 N.E.2d 411, 413 (1987) (parol evidence should not be used where the contractual language is clear on its face); *Fireman's Fund Ins. Co. v. Mitchell–Peterson, Inc.,* 63 Ohio App.3d 319, 328, 578 N.E.2d 851, 856 (Butler Cty.1989) (same).

The application of these two methods of analysis to the case at bar results in contradictory results. Assuming INA's insurance contract is ambiguous, the INA insurance policy must be interpreted against INA. The rationale behind this rule of law is that the insurance company, as drafter of the policy, was in the best position to avoid the ambiguity at the time the policy was drafted. *See generally,* Richard A. Posner, *Economic Analysis of the Law,* § 4.5 at 95 (3d ed. 1986) ("[o]ne's insurance coverage will turn out to be less extensive than it appeared to be, if ambiguities in the insurance policy are resolved against the insured. The insurance company is the superior bearer of the risk, too."). One judge elaborated eloquently about this policy:

Ambiguities are held against the insurer for a very good reason, and this rule protects both the insurer and the insured. The insured ought not to be expected to provide coverage beyond what is paid for as calculated by the statistical risk. The insured ought not to guess at what he's buying. When ambiguous language is used the insurer may be made to pay for a risk not covered, or the insured may find he does not have the protection he thought

he had. As a result, one side or the other will sue and the result is excessive, and unneeded, litigation.

The logic for this rule is compelling. Insurance companies base their rates on experience, and keep statistics dealing with the various kinds of accidents. As a corollary, the insurers have records on the kinds of litigation which arises out of policy language. The rule construing ambiguities against the insurer is not designed to stick it to the insurance companies, but rather to insist that they use their prior knowledge about these kinds of policy language disputes to affirmatively include, or exclude, the ambiguous areas of coverage.

*Crow v. Marine Office Appleton & Cox Corp.,* Case No. 374, 1981 WL 6028 (Vinton Cty. Sept. 24, 1981) (available in LEXIS Ohio Library) (Grey, J., concurring).

We draw a contrasting conclusion when we examine the intent of INA and NARC when they entered their contract. The affidavits of John Wetterich, President of NARC, and John Iori, the insurance agent, describe NARC's need for insurance coverage for its operations on the water. Furthermore, the facts of this case affirm the testimonials of these *post hoc* affidavits. NARC purchased general liability coverage from USF & G to protect it from claims asserted by persons injured on the land at 3291 Southside Avenue.[3] Because many of NARC's activities at 3291 Southside Avenue involved the Ohio River, NARC also purchased a wharfinger policy.

In other words, NARC desired to insure itself against personal injury claims arising from its activities at 3291 Southside Avenue. As a result, NARC purchased a general liability policy from USF & G. However, USF & G's general liability policy specifically excluded injuries occurring on the water. Consequently, NARC purchased a wharfinger policy from INA to cover injuries which did occur on the water. Mr. Winningham was injured while untangling an electric wire 75 to 100 yards from the water.

This Court cannot conceive of, nor has the Plaintiff offered, any reason why NARC would purchase *two* insurance policies to cover the *same* claim. If NARC desired additional insurance protection for someone who hurt themselves on the land, then NARC would have purchased a policy from USF & G with a higher amount of coverage. Consequently, the evidence is undisputed that NARC intended to purchase two different policies—one to protect against claims arising from personal injuries occurring on the land and one to protect against claims arising from personal injuries occurring on the water.

As a result, we must resolve two apparently conflicting conclusions: (1) INA's insurance contract should be interpreted against INA because it is ambiguous; and (2) INA and NARC did not intend the insurance policy to cover claims made by persons injured on the land. The law is clear as to how this Court must proceed. "[T]he polar star of construction of an insurance contract is the intention of the parties. . . ." John A. Appleman and Jean Appleman, 13 Insurance Law and Practice, *Construction of Insurance Policies* § 7385, at 110 (1992). Courts and scholars agree that the intent of the parties to an insurance contract outweighs the maxim of interpreting ambiguous insurance contracts against the insurer. The United States Court of Appeals for the Fourth Circuit explained this rule almost fifty years ago:

It is of course elementary that where a[n] . . . insurance policy is ambiguous it is to be construed against the maker, thereof, namely, the insurance company. . . . However, the main thing to be considered is what was the true intent of the parties, and this may be deduced . . . [from among other areas, the] acts and transactions between the parties. Irrespective of any other rules of construction the real intent and agreement of the parties and what they intended and meant when they entered into the contract of insurance is what must govern the court in determining the respective liabilities.

---

**3.** We recognize that the USF & G policy covered more than just personal injuries claims occurring on the land.

*Pilgrim Laundry & Dry Cleaning Co. v. Federal Ins. Co.*, 140 F.2d 191, 193 (4th Cir.1944). The Sixth Circuit appears to have drawn a similar conclusion in *United States v. Strip*, 868 F.2d 181, 185 (6th Cir.1989) (citations omitted), when it held that the maxim of interpreting an ambiguous insurance policy against the drafter does not apply "if the language is clear [or] if applying it, would provide an unreasonable or forced interpretation." *See also Hobbs v. Fireman's Fund American Ins. Cos.*, 339 So.2d 28, 36 (La.App. 3d Cir.1976) (subsequent history omitted) ("we construe ambiguous phrases along the lines intended by the parties to the instrument"); *Cotton States Life Ins. Co. v. Knowles*, 45 Ala.App. 607, 610, 234 So.2d 886, 880 (1970) ("if, when examined in its entirety, the provisions of the policy are in conflict and ambiguous, they must be construed so as to speak the intent of the parties"); George J. Couch, 13 Couch on Insurance § 15.87, at 427–428 (Rev. ed. 1992) (a court should not interpret an ambiguous insurance policy against the insurer if it thwarts the intent of the parties); 43 Am.Jur.2d, *Insurance*, § 285, at 360 (1992) ("[t]he rule of construction favorable to the insured does not conflict with the rule that contracts of insurance should be construed so as to carry out the true intentions of the parties, since it applies only when there is ambiguity so that the intent of the parties is not clear"); *see generally, A.M. Larson Co. v. Lawlor Ins. Agency*, 153 Conn. 618, 220 A.2d 32 (1966) (rule of construction of favor of insured with ambiguous language has no application where the construction argued by the insured renders the language meaningless).

Furthermore, the preeminence of the parties' intentions in insurance contract interpretation makes good sense upon reflection. The duty of the court in a contractual dispute is to enforce the agreement which the parties entered. Courts examine the plain language of the contract, because the contractual language serves as the most reliable and discernable evidence of the parties' intent. If the language is ambiguous, courts can then resort to extrinsic evidence to arrive at the parties' intentions. By resorting to extrinsic evidence, the courts are still attempting to enforce the agreement the parties intended to enter.

In contrast, by construing an ambiguous contract against the drafter, a court is admitting that it cannot decipher what the parties intended. Because the contract is poorly drafted, the court imposes liability upon the party in the best position to avoid the ambiguity, the drafter-insurance company. Thus, a court should interpret an insurance contract against the drafter only when the parties' intentions cannot be discerned from either the language of the insurance contract or the extrinsic evidence surrounding the formation of the insurance contract.

Therefore, even if the language in INA's and NARC's insurance contract is ambiguous, the extrinsic evidence demonstrates that NARC and INA did not intend to insure against claims from persons injured on the land at 3291 Southside Avenue.

### Plaintiff's Motion for a New Trial

Mr. Winningham also has moved this Court to grant a new trial under Fed. R.Civ.P. 59. The Plaintiff offers two reasons why this Court should grant a new trial: (1) the Court improperly admitted evidence concerning Mr. Winningham's prior criminal convictions; and (2) the jury awarded an inadequate verdict.

█ After considering the Plaintiff's arguments, we find that a new trial is unnecessary. The Defendants used Mr. Winningham's criminal convictions not to attack his truthfulness as a witness; but rather, to show that Mr. Winningham's problems after April 28, 1988 were not entirely caused by his injury that evening. The jury needed this evidence to determine how much Mr. Winningham was harmed emotionally by his accident on April 28, 1988. Therefore, upon review, this Court affirms its earlier decision to admit the evidence of Mr. Winningham's criminal convictions.

█ Second, the Plaintiff argues that this Court should grant a new trial because the jury awarded an inadequate verdict. Under Fed.R.Civ.P. 59(a), a new trial may also be granted if the jury verdict is contrary to the clear weight of the evidence. *TCP Indus., Inc. v. Uniroyal, Inc.*, 661 F.2d 542, 546 (6th

Cir.1981). As this Court has already noted, the jury's findings on Mr. Winningham's damages were relatively low. However, in light of all the evidence, the jury's findings were not irrational or based upon passion or prejudice. Therefore, the Plaintiff's Motion for a New Trial is denied, because the verdict was not contrary to the clear weight of the evidence.

## CONCLUSION

After scrutinizing the language of INA's wharfinger policy, we are convinced that the Plaintiff's "argument stretches and twists the plain meaning of the words of the agreement further than even the most elastic of rational minds can accept." *See Gangemi v. Gen. Elec. Co.*, 532 F.2d 861, 866 (2d Cir.1976). INA's wharfinger policy simply does not cover the personal injuries of a person moving an electrical wire 75 to 100 yards from the water. Moreover, evidence outside the four corners of the insurance policy confirms that the parties to the contract did not intend the wharfinger policy to cover injuries on the land. Instead, NARC and INA intended USF & G's comprehensive general liability policy to cover injuries such as Mr. Winningham's.

Accordingly, the Supplemental Defendants' Motion for Summary Judgment is granted, and the Plaintiff's Motion for Summary Judgment on the Supplemental Petition is denied. Finally, the Plaintiff's Motion for a New Trial is also denied.

SO ORDERED.